UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 15-cr-30018-MGM |
| ) | |
| ALEXANDER CICCOLO, ) | |
| a/k/a Ali Al Amriki, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM AND ORDER REGARDING
GLOBE'S MOTION TO INTERVENE AND FOR RECONSIDERATION OF ORDER
ALLOWING MOTION TO SUBSTITUTE EXHIBIT
(Dkt. No. 32)

ROBERTSON, U.S.M.J.

I.      INTRODUCTION

This action arises out of a July 20, 2015 Order by this court granting the government's Assented To Motion to Substitute Exhibit (Dkt. No. 18). The Order withdrew a 8-1/2 minute video recording of defendant Alexander Ciccolo's ("Defendant") post-arrest statement that was played at his July 14, 2015 detention hearing and substituted a version of the video in which Defendant's face is obscured (Dkt. No. 19).

Boston Globe Media Partners, LLC (the "Globe") moves to intervene for the limited purpose of seeking reconsideration of the court's July 20, 2015 Order and for leave to inspect and copy the exhibit in the form in which it was offered and admitted at the July 14, 2015 detention hearing (Dkt. No. 32). The government does not oppose the Globe's motion to intervene for the limited purpose of asking the court to reconsider its July 20, 2015 Order but does oppose the Globe's motion for reconsideration (Dkt. No. 42). Defendant opposes the Globe's motion to intervene and for reconsideration (Dkt. No. 43). For the reasons stated below,

the court will grant the Globe's motion to intervene for the limited purpose of asking the court to reconsider its July 20, 2015 Order. The court denies the Globe's motion for reconsideration.

II.   BACKGROUND

   A.   Investigation and charges

According to an affidavit of F.B.I. Special Agent Paul Ambrogio ("S.A. Ambrogio") filed in support of the government's motion for detention, the FBI's Joint Terrorism Task Force ("JTTF") began investigating Defendant's activities in support of ISIL, a foreign terrorist organization, in or around September 2014 (Dkt. No. 12-3). The JTTF learned during its investigation that Defendant was interested in martyrdom for the sake of Islam and strongly supported the armed activities of ISIL (*id.* at ¶¶ 15, 16). Defendant, for example, made a Facebook posting under the name "Ali Al Amriki," stating "Thank you Islamic State! Now we don't have to deal with these kafir[1] back in America," accompanied by an image that appeared to be of a dead American soldier (*id.*).

On June 24, 2015, Defendant met with a cooperating witness (the "CW") in Pittsfield, Massachusetts and spoke about his plans to travel to another state to conduct a terrorist attack on civilians, members of the U.S. military, and law enforcement personnel (*id.* at ¶ 18). Defendant told the CW that he would attack two different bars and a police station by using improvised explosive devices, including pressure cooker bombs and portable microwave bombs (*id.*). On June 30, 2015, Defendant met with the CW in Springfield, Massachusetts and praised the shooting attack at a beachside resort in Tunisia for which ISIL claimed credit (*id.* at ¶ 19). Defendant continued to talk about his plan to conduct a terrorist attack in another state, explaining that he wanted to conduct an attack at a university instead of a police station because

---

[1] "Kafir" means non-believers of Islam (Dkt. No. 12-3 ¶ 15).

there were more people at the university (*id.* at ¶¶ 20-22).  According to Defendant, the attack would concentrate on the college cafeteria and dorms so that he could broadcast live executions of students via the internet (*id.* at ¶ 20).  Taking his cue from the Boston Marathon bombing, Defendant told the CW that the explosives would include bombs made with pressure cookers (*id.*).  Defendant wrote out a list of items that would be needed to conduct the attack, including four AK-47s, two sniper rifles, four handguns, gelignite, black powder, and improvised grenades (*id.* at ¶ 20).

On July 2, 2015, Defendant had an online conversation with the CW in which he reaffirmed that the target was a college cafeteria and that the target place was "very sinful and has a crowd" (*id.* at ¶ 30).  On July 3, 2014, Defendant bought a pressure cooker at a Walmart in North Adams, Massachusetts (*id.* at ¶ 31).  He wrote to the CW that he had purchased the pressure cooker and had made ten fire bombs (*id.* at ¶ 32).  On July 4, 2015, Defendant accepted delivery from the CW of four firearms that had previously traveled in interstate commerce (*id.* at ¶ 33).  The firearms were a 9mm Glock 17 handgun, a 10mm Glock 20 handgun, a .223 Colt AR-15 rifle, and a 556 Sig Arms SG550 rifle (*id.*).  Thereafter, Defendant was arrested and charged with being a felon in possession of a firearm that had traveled in interstate commerce in violation of 18 U.S.C. § 922(g)(1) (Dkt. No. 4).[2]  After Defendant was arrested, he stabbed a nurse in the head with a pen at the Franklin County House of Correction, causing the pen to break in half (Dkt. No. 12-3 ¶ 39).

---

[2] 18 U.S.C. § 922(g)(1) makes it unlawful for a person who has been convicted in any court for a crime punishable by imprisonment for a term exceeding one year to possess a firearm that has traveled within interstate commerce.  On February 17, 2015, Defendant was convicted in the Northern Berkshire District Court of operating a motor vehicle under the influence of liquor in violation of Section 24(1)(a)(1) of Chapter 90 of the Massachusetts General Laws, a crime punishable by up to 30 months imprisonment (Dkt. No. 12-3 ¶ 13).

During a post-arrest interview with S.A. Ambrogio, which was video recorded, Defendant reaffirmed his support of ISIL and the violent acts committed by ISIL members (*id.* at ¶ 35). The interview included, but was not limited to, the following exchanges:

- When S.A. Ambrogio asked Defendant about his feelings about ISIL, Defendant responded "they are doing a good thing."
- In regards to recordings of beheadings broadcast on the internet by ISIL, Defendant told the agent that "the people you see being executed are criminals."
- He stated that when "a group of people begins implementing something other than Sharia, they are enemies."
- When the agent asked if the United States was an enemy, Defendant responded "yes."

On July 23, 2015, Defendant was indicted by a federal grand jury for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and assault with a dangerous weapon causing bodily injury in violation of 18 U.S.C. §§ 111(a)(1) & 111(b) (Dkt. No. 22).

B. Detention hearing

On July 14, 2015, the court held a detention hearing under the Bail Reform Act, 18 U.S.C. § 3142(f) (Dkt. No. 17). During the hearing, in support of its motion for detention, the government played a 8-1/2 minute video recording of Defendant's post-arrest statement during his interview with S.A. Ambrogio (Dkt. No. 42-1 ¶¶ 3, 4). The video was played in open court and entered into evidence as Exhibit 1 without objection (Dkt. No. 15). As is set forth above, during the interview, Defendant expressed his support for ISIL, its goals, and its violent activities (Dkt. No. 42-1 ¶ 3). In the recording, Defendant appeared composed, articulate, and committed to his views.

C. Assented-to motion to substitute exhibit

On July 17, 2015, the government filed its assented-to motion to substitute a redacted version of the 8-1/2 minute video recording it had entered as Exhibit 1 at the detention hearing (Dkt. No. 18). In the substitute version of the video, Defendant's face is obscured (*id.* at 1).

Otherwise, the original and the substitute video are the same (*id.*). The government explained that, in view of concerns about the use of social media to recruit terrorists, it had improvidently used an unredacted version of the recording at the detention hearing (*id.* at 2). The government stated that a redacted version of the video in which Defendant's faced is not shown "would have significantly less recruiting value" (*id.*). The government indicated that Defendant assented to the motion to protect his "privacy with respect to the circulation of the video recording on the internet" (*id.* at 2).

On July 20, 2015, the court granted the government's assented-to motion and the government filed the redacted version of the video (Dkt. No. 19).

D.  The Globe's motion

On August 10, 2015, the Globe filed the instant motion to intervene and for reconsideration of the court's July 20, 2015 Order (Dkt. No. 32). The Globe contends, in summary, that the press and public have a common law right of access to the unredacted exhibit introduced during the July 14, 2015 detention hearing and that the government has failed to overcome the public's presumptive right of access to the original version of the recording (Dkt. No. 33 at 3-5).

III.   DISCUSSION

A.  Motion to Intervene

The government does not oppose the Globe's request to intervene for the limited purpose of seeking reconsideration of the Court's July 20, 2015 Order (Dkt. No. 42 at 1). Although the general rule is that "the right of a non-party to intervene in a criminal proceeding is doubtful," *In re Globe Newspaper Co.*, 920 F.2d 88, 90 (1st Cir. 1990), federal courts generally have permitted limited intervention by the media for the purpose of pursuing a request for access to

material made part of the record during court proceedings. *See, e.g., In re Boston Herald, Inc.*, 321 F.3d 174 (lst Cir. 2003); *Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404 (1st Cir. 1987); *U.S. v. DiMasi*, No. CR. 09-10166-MLW, 2011 WL 915349, at *2 (D. Mass. Mar. 16, 2011). Accordingly, the court allows so much of the Globe's motion as requests leave to intervene for the purpose of seeking reconsideration of the court's ruling on the government's motion to substitute a redacted excerpt of the video recording of Defendant's post-arrest interview.

      B. <u>Motion for reconsideration of the court's July 20, 2015 Order</u>

         1. <u>Legal standard</u>

There is "a presumption that the public has a common-law right of access to judicial documents." *In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002) (citing *Nixon v. Warner Commc'n, Inc.*, 435 U.S. 589, 597 (1978)); *see also In re Gitto Global Corp.*, 422 F.3d 1, 6 (1st Cir. 2005). This presumptive right of access attaches to those documents "which properly come before the court in the course of an adjudicatory proceeding and which are relevant to adjudication," *Standard Fin. Mgmt.*, 830 F.2d at 412-13, and "extends to 'materials on which a court relies in determining the litigants' substantive rights.'" *In re Providence Journal Co.*, 293 F.3d at 16 (quoting *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir. 1986)). The presumption arises from the recognition "that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system." *Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 10 (1st Cir. 1998) (citation and internal quotation marks omitted). "The appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the

concomitant right of the citizenry to appraise the judicial branch." *Standard Fin. Mgmt.*, 830 F.2d at 412-13.

The presumptive right, however, is not absolute. *See Nixon*, 435 U.S. at 597; *Siedle*, 147 F.3d at 10. "With regard to recordings admitted as evidence . . ., the First Circuit has stated that 'a trial court *may* allow the media to copy [recordings] that have been admitted into evidence; none of the constituent cases stands for the proposition that a trial court *must* afford such access.'" *U.S. v. Sampson*, 297 F. Supp. 2d 342, 345 (D. Mass. 2003) (quoting *In re Providence Journal*, 293 F.3d at 16-17) (emphasis in original). "Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat access." *Siedle*, 147 F.3d at 10. "Among the countervailing factors favoring non-disclosure are (i) prejudicial pretrial publicity; (ii) the danger of impairing law enforcement or judicial efficiency; and (iii) the privacy interests of third parties." *U.S. v. Salemme*, 985 F. Supp. 193, 195 (D. Mass. 1997) (citing *U.S. v. Amodeo*, 71 F.3d 1044, 1050 (2d Circuit 1995); *U.S. v. McVeigh*, 119 F.3d 806, 813-14 (10th Cir. 1997); *In re Globe Newspaper Co.*, 729 F.2d 47, 59 (1st Cir.1984)). The United States Court of Appeals for the Eleventh Circuit has set out the following factors to be considered when balancing the public's right of access against countervailing concerns: whether the records are sought for an illegitimate purpose; whether access is likely to promote public understanding of a historically significant event; whether the press has already been given substantial access to contents of the records; whether providing the records would cause administrative difficulties and delay trial proceedings; and, most importantly, whether public access to the records might impinge on a defendant's right to a fair trial. *See U.S. v. Trofimoff*, No. 8:00-CR-197-T-24EAJ, 2001 WL 1644230, at *2 (quoting *Newman v. Graddick*, 696 F2d 796 803 (11th Cir. 1983)). To determine whether a countervailing interest should prevail over the public's right of access, a

court must carefully balance the competing interests in light of the relevant facts and circumstances of the particular case. *See Nixon*, 435 U.S. at 597; *Siedle*, 147 F.3d at 10. The burden to overcome the presumptive right of access falls on the party seeking to seal the documents. *See Standard Fin. Mgmt.*, 830 F.2d at 411.

On the Globe's side of the scale, as it points out, there is substantial support in the case law in the First Circuit and in other jurisdictions for granting public access to recordings entered into evidence in criminal proceedings (Dkt. No. 33 at 4). That the words spoken during Defendant's interview with S.A. Ambroglio are already publicly available does not, standing alone, tip the balance in favor of denying access. In 1980, the United States Court of Appeals for the Second Circuit observed that even though the public was already aware of the words that were spoken in certain videotapes at issue, because transcripts of the recordings had been released, "there remain[ed] a legitimate and important interest in affording members of the public their own opportunity to see and hear evidence that record[ed] the activities" of the defendant and law enforcement. *In re Application of Nat'l Bradcasting Co. (Myers)*, 635 F.2d 945, 952 (2d Cir. 1980).

The public has a strong interest in watching Defendant's speak his thoughts. The First Circuit has said that "[t]errorism is the modern-day equivalent of the bubonic plague: it is an existential threat." *U.S. v. Mehanna*, 735 F.3d 32, 40 (1st Cir. 2013). The possibility of home grown terrorist acts inspired, but not directed, by foreign members of ISIS or ISIL is now a highly and rightly feared risk. *See, e.g., U.S. v. Bell*, 81 F. Supp. 3d 1301 (M.D. Fla. 2015) (sentencing American defendant inspired by video teachings of Anwar al-Awlaki). Although Defendant currently faces a single charge of being a felon in possession of a firearm, the government's investigation of him was prompted by concerns that he was planning a terrorist

attack (Dkt. No. 12 at 2). The reasons why an American citizen might become "obsessed with Islam" and plan to engage in violence in support of ISIL are questions of substantial public concern (*id.* at 2-3). Thus, access to the portion of Defendant's post-arrest statement to the F.B.I. that was shown at the detention hearing "is likely to promote public understanding of a historically significant event." *Trofimoff*, 2001WL 1644230, at *2.

On the other side of the scale, the government has identified a compelling countervailing factor. The government's motion to file a substitute exhibit and its continuing opposition to media access to the unredacted video recording is based on its concern that the unredacted version of the recording could be used as an effective on-line recruiting tool by ISIL (Dkt. No. 42 at 4-5).[3] The government initially made this contention by proffer, representing that it "believe[d] that ISIL recruited the defendant in part through videos posted on social media sites, and that it could effectively use an unredacted version of the defendant's post-arrest statement – in which he vigorously defends ISIL – to recruit others" (*id*. at 5). In support of its opposition to the Globe's motion, the government has bolstered its position by filing S.A. Ambrogio's supporting affidavit, in which the agent represents that he spoke about the recording of Defendant's statement with Sebastian L. Gorka, Ph.D., holder of the Chair of Military Theory at the Marine Corps University, whose areas of research include terrorism, counterterrorism, and terrorist strategy (Dkt. No. 42-1 at 2). S.A. Ambrogio's affidavit describes Dr. Gorka's

---

[3] The government also argues that, once the court allowed its motion to substitute redacted exhibit 1, the redacted exhibit became the only judicial record publicly introduced at the detention hearing and the only document to which the right of public access applies. This argument is unpersuasive. The unredacted version of the recording was played at the detention hearing and introduced into evidence without objection. Along with the court, members of the public and the media were in attendance and viewed the unredacted recording. The government cannot put the cat back in the bag. *See Standard Fin. Management Corp.*, 830 F.2d at 409 ("relevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the right of public access applies").

credentials and experience in detail (*id.* at 2-4). In Dr. Gorka's opinion, ISIL is a proficient user of social media, and has run a highly effective on-line recruiting program using sophisticated products (*id.* at 4). The government reports that, in Dr. Gorka's opinion, a video in which Defendant's face has been obscured would be "practically worthless from the point of view of effective terrorist propaganda." In contrast, an unredacted video of an American citizen expressing the views expressed by Defendant, including a desire for martyrdom, and who was arrested while taking steps to execute a terrorism plot in the United States, would be "especially attractive as a propaganda asset" (*id*. at 5). As the government points out, the Globe and other media outlets have repeatedly reported that enemies of the United States and its allies successfully use social media to recruit followers and incite violence (Dkt. No. 42 at 14). Case law from a number of jurisdictions reflects that individuals shown to have been influenced by jihadist social media have planned to engage in acts of violence in this country and elsewhere. *See, e.g., Mehanna*, 735 F.3d at 42, 46, 59-60; *Bell*, 81 F. Supp. 3d at 1306-1307; *see also, e.g., U.S. v. Amawi*, 695 F.3d 457, 466 (6th Cir. 2012). Defendant joins in the government's opposition to the Globe's request to publicize the unredacted version of the video out of concern that, if the video were used to encourage support for ISIL, the government might reference that use of his statements at the time of sentencing in support of an enhanced sentence (Dkt. No. 43 at 1).

It would have been helpful had the government more clearly explained the reasons why a recording of Defendant's statement in which his face is obscured will lack value to ISIL as an additional weapon in its arsenal of on-line recruiting material. Nonetheless, the government has supported this particular point by reference to the opinion of a well-qualified expert (Dkt. No. 42-1 at 2-4). The Globe has not provided the court with any countervailing opinions. In the

court's view, the government's showing , while not overwhelming, is adequate to make out a compelling interest in preventing the public broadcasting of a recording that, in unredacted form, might contribute to the on-line recruitment of individuals interested in the goals of ISIL, thereby impairing the goals of law enforcement and increasing genuine risks to public safety.  *See Salemme*, 985 F. Supp. at 195.

Moreover, in moving to substitute a version of the recording in which only Defendant's face is obscured, the government proposed a narrow remedy, carefully tailored to protect against the misuse of a judicial record, while allowing the media – and the public – access to Defendant's words and overall appearance, which is the critical substance of the video recording.  *See Trofimoff*, 2001 WL 1644230, at *3.  Defendant's words and the inflections of his voice, as well as his gestures and posture during the interview, can all be observed in the redacted recording.  Photographs of his face obtained from other sources have appeared in newspaper articles.  In other words, "the press has already been permitted [very] substantial access to the contents of the record[]."  *Id*. at *2.  The substitution is a de minimus intrusion on the public's right of access to judicial documents.

Because the government has met its burden of overcoming the presumptive right of public access to the video recording of Defendant's statement in its unredacted form, the Globe's motion for leave to inspect and copy the exhibit in the form in which it was introduced at the July 14, 2105 detention hearing is denied.

IV.    CONCLUSION

For the foregoing reasons, it is hereby ORDERED that so much of the Globe's motion as sought intervention is ALLOWED for the limited purpose of requesting reconsideration of the court's July 20, 2015 Order.  The motion is otherwise DENIED.

/s/ Katherine A. Robertson\_\_\_\_\_
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED: December 21, 2015