UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 15-cr-30018-MGM |
| ALEXANDER CICCOLO, | ) | |
| a/k/a Ali Al Amriki, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Alexander Ciccolo was a soldier of the Islamic State of Iraq and Syria ("ISIS").   Ciccolo heeded the call of ISIS to commit terrorist attacks in the United States.   He intended to inflict maximum damage upon the United States and create mass casualties on behalf of ISIS.   When he was arrested, he was planning to attack a university using firearms and improvised explosives, and attempted to recruit others to assist him in his attack plan.   Indeed, even after being arrested, he attacked a nurse who was merely trying to provide him medical care.

On May 21, 2018, pursuant to a plea agreement, Ciccolo pleaded guilty to all counts of the Superseding Indictment, including providing material support to ISIS in violation of 18 U.S.C. § 2339B.   Because of the seriousness of Ciccolo's crimes, the parties have agreed to recommend the following sentence: incarceration for 20 years followed by a lifetime of supervised release, a fine within the sentencing guidelines unless the Court deems the defendant unable to pay, a mandatory special assessment of $400, and forfeiture as set forth in paragraph 8 of the plea agreement. (Doc. No. 192).   For the reasons discussed below, the parties believe the Court should accept the plea agreement and impose this sentence.

I.   Factual Background

A.   Guilty Plea

On May 21, 2018, Ciccolo pleaded guilty to all counts of the Superseding Indictment: (1)

Attempted Provision of Material Support of a Foreign Terrorist Organization; (2) Attempted Use of Weapons of Mass Destruction; (3) Prohibited Person in Possession of Firearms; and (4) Assault With a Dangerous Weapon Causing Bodily Injury. The defendant further stipulated to the following facts, among others:

1.      On or about November 12, 2014, Ciccolo's Facebook page depicted a photograph of Dzhokhar Tsarnaev, the man convicted for the terrorist bombing of the Boston Marathon, and the words "JUSTICE FOR JAHAR KEEP THE HOPE."   Ciccolo posted above the picture, "Free Jahar.   Free all Muslim prisoners."

2.      Ciccolo accessed and posted links to videos of ISIS soldiers beheading non-believers on Twitter.

3.      Ciccolo communicated with several individuals cooperating with the government ("Confidential Human Sources" or "CHSs") on social media and online messaging platforms. In these communications, Ciccolo discussed his support of ISIS, explosives, torture, interrogation techniques, and a hatred and distrust of the United States.

4.      On June 24, 2015, Ciccolo contacted and had an in-person meeting with CHS #1 in Pittsfield, Massachusetts.   During this meeting, Ciccolo spoke about his plans to travel to another state to conduct terrorist attacks on civilians, members of the U.S. military, and law enforcement personnel.   Ciccolo told CHS #1 that he and three other individuals would attack two different bars and a police station, which he described geographically.   Ciccolo stated that two of the attackers would split up and attack the bars and the remaining two attackers would assault the police station.   Ciccolo stated that he planned to use improvised explosive devices during the attack to include pressure cooker bombs and/or portable microwave bombs.   Ciccolo stated that: "you put umh, take a pressure cooker…fill it up with ah, black powder…Yeah, you fill it up with

ball bearings, nails, glass, rocks . . ."   Ciccolo also explained that the improvised explosive device would have a "built in timer" and that the device "heats itself up."

5.      On June 30, 2015, Ciccolo met with CHS #1 for a second time in Springfield, Massachusetts.    During that conversation, CHS #1 asked Ciccolo whether he had heard what happened in Tunisia.   Ciccolo responded, "Awesome.   Awesome, you know that ah, that brother in Tunisia was impressive … he got like 38, 39 people … one guy … that is a huge accomplishment I think."   Ciccolo was referencing the June 26, 2015 shooting attack at a beachside resort in Tunisia in which one person used firearms and grenades to kill 38 people.   The gunman was killed and ISIS claimed credit for the attack.   That same day, additional terrorist attacks occurred in other cities in France and Kuwait, in what appeared to have been coordinated fashion.   Ciccolo referenced the attack in France, saying something to the effect that "I think he cut off his boss's head [and] somehow pinned it to the gate of his work."

6.      Ciccolo continued to talk with CHS #1 about his plan to conduct a terrorist attack in another state.   Ciccolo wrote out a list of items that would be needed to conduct the attack, including: four (4) AK-47s, two (2) sniper rifles, four (4) handguns, gelignite (which Ciccolo explained was a blasting gelatin, "a variety of dynamite"), black powder (a low explosive which Ciccolo explained could be extracted from fireworks), and improvised grenades.   Ciccolo explained how he would construct the grenades, and described them essentially as pipe bombs. CHS #1 then drew a map of the United States and Ciccolo wrote on the map to show CHS #1 where the states that he was interested in were located on the map.   Ciccolo also stated that he wanted to conduct an attack at the State University in that state using assault rifles and improvised explosives.   Ciccolo told CHS #1 that the attack would be concentrated in the college dorms and cafeteria, to include executions of students which would be broadcast live via the internet.

Ciccolo stated that he planned to rob a gun store to obtain firearms and travel out of state to purchase fireworks in order to obtain black powder needed for the attacks.   Ciccolo told CHS #1 that the items obtained for the attack could be stored at Ciccolo's apartment.   Ciccolo stated his apartment was safe and that there were no kids living there, and that he lived alone.    Ciccolo also stated he would purchase pressure cookers to use as improvised explosive devices.

7.      During the June 30, 2015 meeting, Ciccolo also explained that he had changed his plans from targeting a police station to targeting a university because there were many more people at the university.   Ciccolo said that if a student was Muslim, then he or she would be permitted to help, sit tight, or leave.   Ciccolo said that he knew how to use sniper rifles, and that he had grown up with guns.   "I know what I'm doing," he explained.   Ciccolo told CHS #1 that he wanted to have "tons of ammo" for the assault rifles.   Ciccolo told CHS #1 that he previously owned a .38 caliber revolver and a shotgun, but that he had since sold them.   Ciccolo said that he wanted to do it before Ramadan was over, and no later than July 31, 2015.   He said that he wanted to ensure that there were a lot of people there and that he wanted the conditions to be right where he could see it with his own eyes.   Ciccolo said that if he ended up having to make a stand, then that was okay.   He said, "We win or we die."

8.      CHS #1 inquired whether Ciccolo had acquired any explosives, and Ciccolo said that "We are gonna need the same stuff as before."   Ciccolo said that they would use two pressure cooker bombs, and that the pressure cookers were not expensive, but the black powder (a low explosive) would be.   Ciccolo said that the Boston Marathon bombers paid four hundred dollars for the amount of fireworks they used.

9.      Ciccolo said that he knew how to build the bombs, and other components were also necessary: "Nails and things like that.   But I already have those.   And I also have aerosol cans

and propane tanks to maximize explosive power."   When asked about the ignition of the bomb, Ciccolo said that "[t]he timer is already built in, it heats up and builds up pressure." Ciccolo said that he would handle acquisition of the ignition source.

10.     During the July 2, 2015 online chat, Ciccolo said "The big thing is guns."   CHS #1 responded that he might be able to help. Ciccolo said, "What I am gonna do is prepare fire bombs. I'll do that today.   T[hey] are cheap and effective."   Ciccolo again lamented that "Really need the guns though.   Otherwise it's a waste of time for me to stay around here akhi [Arabic for brother]."   CHS #1 said that AK-47s (a type of assault rifle) are hard to get.   Ciccolo's response was, "If they are hard to get but you can get something else easier then get the easier one … You still have the list akhi?"   Ciccolo confirmed that his list for guns included four handguns and two assault rifles.   Ciccolo told CHS #1, "You get the rifles.   I'll get the powder.   Then next time we meet I want us to have at least those two things."

11.     In a later instant messaging session on July 2, 2015, Ciccolo told CHS #1, "Things are moving right along."   CHS #1 asked whether the target was the same bar Ciccolo had previously mentioned, and Ciccolo responded that it was not.   He explained that the other place was a cafeteria at the college he had mentioned, but that the target place was "Very sinful and has a crowd."   Ciccolo also said that it was a favorable place to get out of, suggesting that he was also considering the escape routes.   CHS #1 asked to clarify portions of their roles in preparation for the attack, and Ciccolo said, "You get the rifles, I'll get the powder."

12.     On July 3, 2015, Ciccolo purchased a pressure cooker at the Walmart in North Adams, Massachusetts.   Later that day, Ciccolo told CHS #1 in an online chat that he had purchased a pressure cooker: "Allahu Akbar!!![Arabic phrase for God is great] … I got the

pressure cookers today. Alhamdulillah [Arabic phrase for Praise to God]."   Ciccolo also said that

that he had already made ten firebombs.

13.     On July 4, 2015, Ciccolo accepted delivery from CHS #1 of four firearms that

Ciccolo previously had ordered from CHS #1.   Ciccolo was arrested as he was carrying the

firearms towards his apartment.   Ciccolo had in his wallet a Walmart receipt for the pressure

cooker he purchased on July 3, 2015.

B.   Ciccolo's Plot to Carry Out a Domestic Terrorist Attack in Support of ISIS

Months before his arrest, Ciccolo began planning a domestic terrorist attack on an

American university.   Ciccolo had planned to use firearms and improvised explosives, including

several Molotov cocktails and a pressure cooker bomb that he had begun constructing in his

apartment.   He attempted to recruit several individuals to assist him in his plan to commit violent

jihad in the United States on behalf of ISIS.   Unbeknownst to Ciccolo, these individuals were

working with the government.   Ciccolo shared with them recipes for bombs and explosives and

told them that he would also need guns to carry out his attack.   Ciccolo selected a university to

target, and studied the university and town in detail online.   He planned to attack the cafeteria and

dorms and to conduct executions to be broadcast live over the internet.   His dedication to his

martyrdom plan was unmistakable.   While discussing his plan during the recorded meeting, he

revealed to CHS #1 that "we win or we die."

Ciccolo wished to do the maximum damage and inflict the most pain upon his victims

during his attack.   For instance, during a recorded meeting with CHS #1, Ciccolo indicated that

he intended to use "aerosol cans and propane tanks to maximize explosive power."   He said he

wanted to target the cafeteria at the busy lunch hour because he would be able to kill more people.

Most troubling, Ciccolo stated that he planned to use Styrofoam in constructing Molotov cocktails

because it would stick to the victims' skin and burn them longer and more intensely.   Indeed, when FBI searched Ciccolo's home, they found three partially constructed Molotov cocktails containing Styrofoam, a pressure cooker, nails, propane, and aerosol.

On July 4, 2015, Ciccolo left his home in Adams to meet CHS #1, who Ciccolo believed was, like him, planning to kill others in the name of ISIS.   CHS #1, who was working with the government, handed Ciccolo a black duffel bag containing an AR-15 rifle and two handguns. Ciccolo opened the bag, and his eyes widened with excitement.   Appearing elated, he exclaimed, "mashallah!" [an Arabic phrase expressing appreciation, joy, praise, and thankfulness].

Ciccolo was fueled by hatred – hatred of the United States and all those whose beliefs did not mirror his.   He told CHS #4, "I hate Jews." He reached out to a neo-Nazi group to attempt to join forces in their common hatred of Jews, stating: "We have a common enemy and it is the Jew and vile Jewry…we need to destroy the Jew once and for all."   He expressed extreme disdain for gay people, calling them homophobic slurs, and initially planning his terrorist attack on a bar that supported equality for LGBT people.   Ciccolo even lashed out at Muslims who did not believe in violence, telling the FBI that American Muslims who were living their daily lives and not fighting were not true Muslims.

After his arrest and transport to Franklin County Correctional Facility, Ciccolo began the regular intake process.   During the process he visited with a nurse (the "Nurse"), who administered him a tuberculosis test.   Without provocation, Ciccolo suddenly picked up the nearest available weapon—a pen—and stabbed the Nurse on the top of her head more than ten times.   The Nurse immediately ran from the room clutching her head and screaming and crying in pain.   Thus, in addition to planning to commit acts of violence, Ciccolo had put his threats of inflicting pain on innocent Americans into action.

7

II.     The Defendant Merits the Agreed-Upon Sentence

A.   Legal Principles

As the Supreme Court explained in *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), the district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.   The Court must then consider all of the factors in 18 U.S.C. § 3553(a) to determine whether they support the requested sentence and impose a sentence that is "sufficient, but not greater than necessary."   *United States v. Dixon*, 449 F.3d 194, 203-04 (1st Cir. 2006).

B.   Probation Properly Applied the Terrorism Enhancement

The Probation Department correctly determined that the defendant faces a statutory maximum penalty of a lifetime of incarceration.   Presentence Investigation Report dated August 29, 2018 ("PSR"), ¶ 154.   The Probation Department calculated an advisory guidelines sentencing range of life based upon Offense Level 43 and Criminal History Category ("CHC") VI.   PSR, ¶ 155.   Following the defendant's release, he faces a statutory maximum supervised release term of life and an advisory guidelines supervised release term of two years to life.   PSR, ¶¶ 160-61.

The parties agree in the plea agreement that U.S.S.G. § 3A1.4 (the "terrorism enhancement") applies. (Doc. No. 192).   However, the defendant has objected to the automatic increase in CHC that results from the application of the terrorism enhancement, which appears to be a policy-type objection. The Court should overrule this objection for two reasons.   First and foremost, the defendant cannot now object to the application of § 3A1.4 because he agreed to the application of this enhancement in securing his plea agreement and therefore, intentionally and knowingly waived his right to object to the § 3A1.3 enhancement. (Doc. No. 192 at p. 3).   As stated on page 3 of the plea agreement:

The parties agree…in accordance with USSG § 3A1.4, Defendant's offense level…is

8

increased to level 54 and his criminal history category shall be Category VI, because the offenses of conviction are felonies that involved or were intended to promote a federal crime of terrorism.

The Court should not allow the defendant to renege on his plea agreement and now claim that the terrorism enhancement to his CHC should not apply.

Second, if the defendant's argument is aimed at the fairness of the increase to the defendant's CHC, the authors of the Sentencing Guidelines certainly considered this in drafting the enhancement.   The Second Circuit addressed this fairness issue and found the increase to be warranted:

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and criminal history category.

*United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

Further, the Court may apply an enhancement that does not result in the application of a mandatory minimum sentence based upon facts it determines are proven by a preponderance of the evidence.  *See United States v. George*, 761 F.3d 42, 60 (1st Cir. 2014); *United States v. Ramirez-Negron*, 751 F.3d 42, 48 (1st Cir. 2014).   Section 3A1.4 squarely fits the facts of this case, many of which are undisputed.  *See* Stipulation of Facts attached to plea agreement. Section 3A1.4(a) states that if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than 32, increase to level 32."   The Section also increases a defendant's CHC to Category VI.   U.S.S.G. § 3A1.4(b).   A federal crime of terrorism is an offense that "(A) is calculated to influence or affect the conduct of the government by intimidation or coercion or to retaliate against government

conduct;" and "(B) is a violation of…sections…2332a (relating to use of weapons of mass destruction)…[or] 2339B (relating to providing material support to terrorist organizations)."   18 U.S.C. § 2332b(g)(5).   Ciccolo was convicted in Counts One and Two for attempting to provide material support to ISIS and attempting to use weapons of mass destruction.

The terrorism enhancement does not require that the defendant was personally motivated by a desire to influence the conduct of the government.   Rather, the government need only show that the defendant "intended to promote a crime calculated to have such an effect, i.e., that his offense was intended to promote a federal crime of terrorism as defined in § 2332b(g)(5), whatever the defendant's reason for committing them."   *United States v. Awan*, 607 F.3d 306, 315-16 (2d Cir. 2010).   The evidence overwhelmingly shows that Ciccolo's crimes, which he committed in furtherance of ISIS's agenda, were intended to influence the U.S. government and to retaliate against the United States for what Ciccolo perceived as atrocities against Muslims.   ISIS's strategic goal is to overthrow non-Islamic governments and achieve total domination of the entire world.   ISIS intends to create a worldwide caliphate, which they will govern under their extremist interpretation of Sharia or Islamic law.   Examples of Ciccolo's support of ISIS and its violent ideology of beheadings and assassinations include, among others:

- Ciccolo's computer contained a speech from the ISIS spokesperson encouraging ISIS supporters to carry out attacks in the West and offering extra rewards from Allah for those who complete an attack during Ramadan.

- Ciccolo viewed videos and images of ISIS beheadings.

- Ciccolo's computer contained an image showing ISIS domination across the whole world



- Ciccolo's computer contained and he distributed to CHS #1 via online chat ISIS's 2015 Mujahid Guide to Surviving in the West, which instructs ISIS members on how to operate and avoid detection by law enforcement in the United States and western nations.   The document instructs:

  o "This book is a guide for the Muslims who are living in a majority non Muslim land, or a country where the rulers are harsh towards the believers. It will explain to you the different scenarios you may get into and how to react. It will teach you how to be a secret Agent who lives a double life, something Muslims will have to do to survive in the coming years."

  o "When the Jihad reaches your neighborhood, rise up and race towards shahadah (martyrdom).  That has been your goal from the beginning, that is why you are reading this book. Do not let the fitnah (temptation) of money and weapons override your intention of istish-haad (seeking martyrdom)."

11

- On or about October 27, 2014, Ciccolo commented on a photograph posted on Facebook that appeared to be a dead American soldier that included the following statement by Ali Al Amriki, "Thank you Islamic State!  Now we won't have to deal with these kafir back in America."

- On or about March 4, 2015, Ciccolo posted on his Wordpress blog:

  > Therefore the establishment of a group is necessary, the bay'ah to this group is necessary, and the active association and assistance with and of this group is necessary. If one branch is left out or focused upon too much, the Islamic State falls apart. If it is not possible to establish a Khilafah of land mass, then it is necessary to establish a Khilafah of people which must then wage Jihad FeesabilAllah to acquire and secure what it is lacking in territory and to create the environment in which Islam can be practiced in its fullest and purest form.

- On or about May 12, 2015, Ciccolo told CHS #4 via online chat: "Things really are different now.   When I was a kid there were barely any attacks in the US and never attacks by Islam.   Beat the nicest dog for long enough and it will bite you."

- On or about June 10, 2015, Ciccolo posted on Facebook: "…it is the disbelievers who are waging war against the Muslims in the West and far East, they are the aggressors, and they are victimizing the Muslim masses and accusing us all of being terrorists….Allah is asking us; why don't you fight a people who broke their covenant of peace (with the Muslims)…."

- On or about June 11, 2015, Ciccolo told CHS #4 via an online chat: "We couldn't ask for a better situation.  Allah has blessed us and approved for us to do His will.  I love you for the sake of Allah.  May He forgive us and make us Shuhada."  "Shuhada" refers to the Arabic word for martyrs.

- On or about June 14, 2015, Ciccolo posted on Facebook: "I've lived a pretty quiet life…too bad, you O [non-believers], had to go and ruin it.  I know you can read this, [non-believers], and I just want you to know who's responsible for the downfall of your country.  It's YOU, not me.  When the vast armies of the [Caliphate] come for your family, I want you to know that it's your fault that they are targeted and enslaved.   All good comes from Allah, all bad comes from yourself.  You really should've listened."

- In a post-*Miranda* statement to FBI after his arrest, Ciccolo emphasized the atrocities by the United States upon Muslims.  Ciccolo stated that (1) ISIS is "doing a good thing;" (2) it is "not an atrocity" when ISIS kills people; (3) ISIS kills women and children "if a woman or child fights;" and (4) ISIS has "only killed people that fight them."

12

- When speaking about atrocities by the United States against Muslims, Ciccolo told FBI agents: "…you guy are responsible.   You guys have some of that responsibility for these atrocities;" and "the atrocities against the Muslim people need to stop. That's, you know, leave us alone."

The Court should find that the § 3A1.4 terrorism enhancement applies because the parties agreed to its application in the plea agreement and the defendant has pleaded guilty to two federal crimes of terrorism.

          C.   <u>Nature and Circumstances of the Offense</u>

At the time of the defendant's crimes, ISIS posed a grave threat to the United States.   Just days after the defendant's arrest, then FBI Director James Comey commented publicly that the FBI had thwarted "attacks tied to the July Fourth holiday," and "arrested more than 10 people inspired by online recruiting by [ISIS]."   *See* July 9, 2015 testimony of FBI Director James Comey testimony before Senate Judiciary Committee, summarized in https://www.cbsnews.com/news/fbi-director-we-disrupted-efforts-to-kill-people-around-july-4-holiday/, last visited Aug. 28, 2018.

Indeed, the defendant knew of this threat to the United States at the time he committed his crimes.   The defendant downloaded several issues of ISIS's propaganda magazine, *Dabiq*, including Issue 4, which states:

> In the Words of the Enemy:   On Tuesday, September 16, 2014, the American crusader and Secretary of Defense Chuck Hagel testified before the US Senate Armed Services Committee in support of the crusade – headed by Barack Obama – against the Islamic State.   Hagel [said] 'ISIL[1] poses a real threat to all countries in the Middle East, our European allies and to America…. While ISIL clearly poses an immediate threat to American citizens in Iraq and our interests in the Middle East, we also know that thousands of foreign fighters, including Europeans and more than 100 Americans have travelled to Syria. With passports that give them relative freedom of movement, these fighters can exploit ISIL's safe haven to plan,

---

[1]ISIL was an acronym the government used to collectively refer to ISIS prior to 2017.   "ISIL" is an abbreviation of the Islamic State of Iraq and the Levant.

coordinate and carry out attacks against the United States and Europe.'

While ISIS has lost ground in the Middle East, a 2018 report of the United States Office of the Director of National Intelligence found that ISIS poses continued threats to the United States. The report found that U.S.-based homegrown violent extremists are still the most prevalent Sunni violent extremist threat in the United States. *See* Daniel R. Coats, *Statement For the Record, Worldwide Threat Assessment of the US Intelligence Community*, Feb. 13, 2018, available at https://www.dni.gov/files/documents/Newsroom/Testimonies/2018-ATA---Unclassified-SSCI.pdf, last visited Aug. 28, 2018.

Though the defendant will likely claim that he posed no danger and that he would not have been able to carry out his terrorist attack in the manner he planned it, he in fact brutally attacked an innocent victim—the Nurse.   While under the Nurse's care, the defendant grabbed a pen and viciously stabbed the Nurse on her head over and over again.   Though her physical wounds are healing, her emotional trauma will be everlasting.   She wrote in her victim impact statement:

> Every day that I work I have to relive your attack.   Every time I have to give a PPD [tuberculosis] shot the flash backs come racing back and it has taken me a long time to learn to put my fears on hold.
> …
> My independence, natural joy, gentleness, and steady lifestyle I had been enjoying became distorted beyond recognition.   I became closed off, angry, tired, and irritable. The isolation at times was unbearable.   You cannot give me back the life I had before that night.   It is embarrassing how feeble I feel, how timidly I move through life, always guarded, ready to defend myself, ready to be angry.

The defendant indelibly tarnished the Nurse's sense of self, happiness, and security.

### D.   History and Characteristics of the Defendant

Undoubtedly, the defendant has struggled with substance abuse and mental illness from a young age and has had an unstable upbringing.   The government has considered these characteristics in coming to an agreement with the defendant regarding the resolution of this case.

Even now, more than two years after his arrest, the defendant continues to espouse violent ideology in line with his extremist interpretation of Islam and Allah's will.   The recordings of telephone calls between the defendant and family members reveal that the defendant continues to support the use of violence.   For example, on April 11, 2018, Ciccolo stated on a recorded call, "We're at the point where Muslims are justified in using violence, yeah I do agree with that."

E. <u>The Agreed-Upon Sentence is Consistent with Other Sentences Ordered in this District</u>

The Court should order the agreed-upon sentence because it is sufficient but not greater than necessary when compared with other sentences ordered for similar terrorism-related offenses in this district.   The following sentences of incarceration have been imposed against defendants sentenced in Massachusetts in cases involving material support of terrorism offenses: (1) David Wright, sentenced in 2017 after trial (**28 years in prison**, lifetime of supervised release); (2) Nicholas Rovinski, sentenced in 2017 after a plea (**15 years in prison**, lifetime of supervised release); (3) Rezwan Ferdaus, sentenced in 2012 after a plea (**17 years in prison**, 10 years supervised release); and (4) Tarek Mehanna, sentenced in 2012 after trial (**17.5 years in prison**, 7 years supervised release).

*<u>Wright and Rovinski</u>*:   In 2015, Wright and Rovinski, who had met online, conspired together and with Usaamah Abdullah Rahim, Wright's uncle, to commit attacks and acts of violence against residents of the U.S.   Rovinski communicated with ISIS members abroad.   On several occasions, Wright, Rovinski, and Rahim met and discussed the beheading of an American journalist.   On June 2, 2015, Rahim informed Wright that he intended to "go after" the "boys in blue," a slang term to describe police officers. Wright encouraged Rahim to attack police officers in Massachusetts.   That same day, Rahim was approached by Boston Police and FBI Agents at a

15

parking lot in Roslindale. Upon seeing the agents, Rahim took out a knife and lunged towards the officers.   In response, law enforcement shot and killed him [Rahim].   Rovinski pleaded guilty pursuant to a plea agreement and testified as a government witness at Wright's trial.

*Ferdaus*:   In 2011, Ferdaus planned acts of violence against the United States, including the Pentagon and U.S. Capitol Buildings using various explosives and remote controlled aircrafts. Ferdaus also designed and constructed detonation components for improvised explosive devices ("IEDs") using mobile phones. Ferdaus then delivered IED components to undercover FBI agents, whom he believed to be members of al-Qaeda, with the intention that they be used to kill U.S. soldiers overseas.   Ferdaus later made a training video containing instructions on building mobile phone detonation devices for individuals he believed to be members of al-Qaeda.   Like Ciccolo, Ferdaus pleaded guilty pursuant to a Fed. R. Crim. P. 11(c)(1)(C) plea agreement.

*Mehanna*:   In 2003, Mehanna and his co-conspirators discussed their desire to participate in violent jihad against American interests and their desire to die on the battlefield. The co-conspirators attempted to radicalize others and inspire each other by, among other things, watching and distributing jihadi videos. Mehanna and two of his associates traveled to the Middle East in 2004, seeking military-type training at a terrorist training camp that would prepare them for armed jihad against U.S. interests, including U.S. and allied forces in Iraq. One of Mehanna's co-conspirators made two similar trips to Pakistan in 2002.

After returning to the United States, Mehanna continued his efforts to provide material support by, among other things, translating and posting on the internet al-Qaeda recruitment videos and other documents.   In December 2006, Mehanna was interviewed by federal authorities regarding a trip by Mehanna, Ahmad Abousamra, and another individual to Yemen in 2004.

During that interview, Mehanna provided false information and made fraudulent and fictitious statements.   Mehanna was convicted after trial.

While no case in this District squarely matches the facts in the instant case, the agreed-upon sentence is appropriate when compared with the sentences received by other defendants convicted of terrorism offenses.

F.   The Need for the Agreed-Upon Sentence

The agreed-upon sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), and to afford "adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B)-(C).   A sentence of 20 years in prison followed by a lifetime of supervised release will serve the important purpose of deterring the defendant and other terrorists from committing crimes of this nature in the future.   It will also incapacitate the defendant and prevent him from doing harm to others and our country.   The sentence will help to rehabilitate the defendant by providing him with treatment for substance abuse and mental illness during his incarceration. A lifetime of supervised release will assist the defendant to reintegrate into society after he serves his term of imprisonment.

In coming to a resolution of this case, the government was mindful of the extreme difficulty family members face when deciding whether to report a loved one to law enforcement.   This case is unique because it began when the defendant's father, Robert Ciccolo, a Captain with the Boston Police Department ("Captain Ciccolo"), alerted the FBI to his son's desire to fight for ISIS.   The government recognizes that Captain Ciccolo's decision to come forward was heartbreaking.   He understood that his son would likely be incarcerated for a long time, but also understood that he could be preventing harm to innocent people.   In reaching the agreement with the defendant, the

17

government recognizes the agonizing decision Captain Ciccolo made, which the government believes likely saved the lives of numerous innocent people.   Through the plea agreement, the government also hopes to encourage others to similarly report suspicious activity to law enforcement.

III.     Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose the sentence of incarceration for 20 years followed by a lifetime of supervised release, a mandatory special assessment of $400, and forfeiture as set forth in paragraph 8 of the plea agreement.

<div style="margin-left: 40%">

Respectfully submitted,
ANDREW E. LELLING
UNITED STATES ATTORNEY

By:   /s/ Deepika B. Shukla
        DEEPIKA B. SHUKLA (NY4584009, CT434931)
        KEVIN O'REGAN (678347)
        Assistant United States Attorneys
        300 State Street, Suite 230
        Springfield, MA 01105
        413-785-0237
        deepika.shukla@usdoj.gov

By:   D. Andrew Sigler
        D. Andrew Sigler
        Trial Attorney
        National Security Division
        United States Department of Justice

</div>

18

CERTIFICATE OF SERVICE

August 31, 2018

I hereby certify that the foregoing was filed by ECF and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Deepika Bains Shukla*
Deepika Bains Shukla
Assistant U.S. Attorney