# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**UNITED STATES OF AMERICA**

**V.**                                      **CRIMINAL NO.  3:15-30018-MGM**

**ALEX CICCOLO a/k/a Ali**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT'S SENTENCING MEMORANDUM IN SUPPORT OF AGREED SENTENCE PURSUANT TO F.R.Crim.P 11 (c)(1)(C)

It is of course the paramount obligation of this court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 USC 3553 (a) (2).  *See, Kimbrough v. United States,* 552 U.S. 85, 101 (2007).  In making its determination as to what that sentence should be, the Supreme Court has instructed that the court consider all of the factors set forth by Congress in subparagraphs (a) (1) – (7) of 18 USC § 3553.  *Id.*  Although no longer mandatory, the Guidelines provide the starting point for determining an appropriate sentence and in fact must be considered.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  *United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008).  The United States Probation Services has of course prepared a Pre-Sentence Report (PSR), in which it has calculated the guidelines, and determined that Mr. Ciccolo is a Level 43 Category VI offender.[1]   His imprisonment range per the Guidelines is therefore life.  Mr. Ciccolo will have been in federal custody since from July 4,

---

[1] Mr. Ciccolo's prior criminal record is negligible and standing alone would put him only in category I.  He is bumped up to criminal history category of VI solely due to application of the "terrorism enhancement" of USSG § 3A1.4 (b).  The defense agrees that this enhancement has been properly applied according to the language of the guideline and existing caselaw.

2015 to September 5, 2018, or 1,160 days, that should be credited to the sentence that this court imposes.

As the court is aware, Mr. Ciccolo has entered his plea pursuant to F.R.Crim.P. 11 (c)(1)(C), with an agreed upon sentence of 240 months.  The plea agreement is therefore beneficial to him insofar as his exposure under the Sentencing Guidelines.  The plea agreement is also beneficial to the Government, for reasons that will be expounded upon in this memorandum, and represents a fair outcome that should be endorsed by the court.

While Mr. Ciccolo's objections to the presentence report were few, we nonetheless, submit this memorandum in support of the sentence requested, by reference to 18 USC § 3553.  Each of the § 3553 factors is considered *seriatim,* below.


### *(1) Nature and Circumstances of the Offense and History and Characteristics of the Defendant*

#### a. *History and Characteristics of the Defendant*

Alex is the only child born of the union between Robert Ciccolo and Shelly Reardon.  Bob and Shelly[2] met when they were very young.  He was only 21 and she was 23.  They were married in 1987 and Alex was born on July 9, 1992.  Bob and Shelly's marriage began to founder almost immediately after Alex's birth.  Shelly suffered from post-partum depression which was untreated, and she was generally much more lenient as a parent than was Bob.  After five years of trying to make the family work, Bob and Shelly separated and eventually divorced, in the wake of a particularly contentious vacation in Pennsylvania.

---

[2] To avoid confusion, Alex and his father will often be referred to by their first name throughout most of this memorandum.  His mother will also be referred to by her first name.  She is remarried and is now known as Shelly MacInnes.

2

The divorce and resulting custody battle was perhaps predictably, also quite contentious. Initially, Alex went to live with his mom in Wareham, while his father lived in Needham. Mom describes Alex as a sensitive boy during these years, who was already struggling socially. He was apparently bullied, severely at times, during his elementary school years.

When Alex was thirteen he had a confrontation with another student over French fries in lunch-room that led to an allegation of threatening behavior, which was compounded by Alex's possession of a small pocket knife. The incident was serious enough to lead to delinquency charges and a shift in physical custody from Shelly to Bob. This was a very troubling time for all involved. Shelly acknowledged that this was a difficult time for her because of her increasing inability to control her now teenage son. The change in custody caused the usual upheaval in the lives of all concerned. Shelly had to adjust to having ceded physical custody of Alex, and to being the non-custodial parent. Bob and his new wife had to learn how to manage a difficult teenage boy under their roof, who was accustomed to much more freedom than his Dad felt was appropriate for a child of his age. And of course, Alex had to deal not only with both of his parents' changes, but also with the move to Needham, a new school, new step-mom and step-sisters.

Things were difficult, and Alex at times acted out in minor episodes of anger, striking his father or throwing things in the home. As a result of these sorts of incidents, Bob took Alex for treatment and medication for Attention Deficit Hyperactivity Disorder. This diagnosis and the medications that Alex took to treat it became a primary point of contention between Bob and Shelly over the ensuing years. Simply stated, Bob felt that Alex had serious mental health issues that merited medical intervention, while Shelly as well as Alex, felt that he was just a normal teenage boy.

Living with Bob in his mid-teenage years meant continuing with psychotherapy, which Alex hated. He also grew to just hate living with Bob generally. He didn't get along with his step-mom and didn't like the house rules that were more strict than those to which he had become accustomed. The treatment records from his psychotherapy provide valuable insight into Alex's deteriorating mental health. The records describe him as "depressed and tearful," and filled with anger and irritability. His relationship with Bob continued to deteriorate. Meanwhile, in early 2007, Shelly experienced a house fire that left her essentially homeless for a brief period. Alex's anxiety over the fire was compounded by the fact that a pet cat and bird were lost in the blaze, as were many of his possessions, including medals and trophies he had won for dressage, a sport in which he had competed as a youngster.

Alex's teenage years are largely addressed in the sections below for Education and Substance Abuse History, as his polysubstance abuse disorder is the defining feature of the latter part of his adolescence.

After Alex dropped out of high school, Bob attempted to find work for him in the Boston area, but the closeness to his high school friends with whom he drank and drugged always proved to be a problem. From the middle of 2010 when he finally left high school until sometime in 2012, Alex wandered from the Greater Boston area to Fort Meyers, Florida, to California. He did not stay long in any one place. His father had tried to provide housing for him in the Boston area and in Fort Meyers, but for a number of reasons, not least of which was his ongoing substance abuse, nothing worked out. He often lived in his car during these years. Bob's wife had forbidden him from returning to their home. In 2012, Bob rented an apartment for Alex in Adams, not far from where his mom and step-father, Stuart MacInnes, lived in Peru, MA.

Shelly and Stuart could see that Alex was looking for some meaning in his life, and eventually persuaded him to seek out the folks at the Peace Pagoda, located in an idyllic rural community near Grafton, NY, at the confluence of the Massachusetts, New York and Vermont borders. Alex spent a lot of time at the Peace Pagoda over the next two years, and joined their spiritual leader Jun-San, a Buddhist nun as well as others, on a number of peace walks around the Northeast. He began using his time to study Islam as well as other religious traditions while staying at the Peace Pagoda. His experience at the Peace Pagoda undoubtedly had a positive effect on him spiritually, physically and mentally, but it was not enough to permanently liberate him from his drug and alcohol demons.

After returning to Adams, Alex became more and more interested in Islam and what was happening in the Middle East, particularly in the Syrian civil war. While his parents were concerned about his increasing obsession with Islam, his new found religion did have the effect of dramatically reducing his use of controlled substances. By the time he was arrested for the offenses charged in this indictment, he had been mostly—but not totally—drug and alcohol free for two years. It is clear however that his years of substance abuse still played a major impact on his ability to think rationally during this time period.

  b.   *Education*

Alex is an inquisitive individual who nonetheless struggled academically throughout his years in school. He always had difficulty concentrating which is consistent with his ADHD diagnosis. After the incident at the Wareham Middle School, Alex was suspended and given an in-home tutor. When he moved to Needham, he entered the Needham public schools in the 8th grade and did not fare well. He had to repeat his eighth-grade year, and the second time around

was given an in-school aide, who happened to be the same person who had been his in-home tutor during his Wareham suspension.

Alex never really fit in at Needham Junior and Senior High School (NHS). Needham is an upscale community and NHS was dominated an "Abercrombie and Fitch" kind of scene, which definitely was not Alex. In addition, by this time Alex had begun experimenting with a wide variety of drugs, which of course impacted his already marginal ability to handle the rigors of a conventional school system.

With deteriorating mental health, Alex was accepted into Outward Bound prior to his ninth grade at Needham. He liked the program and did well in it, but after only a few months he was again struggling in a conventional classroom setting. By the Spring of his 9th grade year he had been transferred to an alternative high school, Phoenix Academy, where he stayed for ninth and tenth grade.

At the beginning of 11th grade Alex once again returned to Needham High. Once again, he could not fit in to that school environment, and spent the rest of the year going back and forth between Needham High, Phoenix Academy, and a treatment program at the Westwood Lodge, a psychiatric treatment facility. He formally dropped out of school in June of 2010.

As indicated earlier in this memorandum, Alex is innately inquisitive. His ability to flourish in a formal educational environment was severely compromised by his ADHD and adjustment issues, which largely stemmed from the ongoing war between his parents, and later from his increasing substance abuse issues. As an adult, he has become a voracious reader not only of Islamic texts, but of books from across a wide spectrum of fiction and non-fiction, ranging from obscure to popular titles.

c.    *Employment*

Alex has never really had a steady job, largely due to his substance abuse issues.  The presentence report strings together his work history as accurately as possible.

d.    *History of Substance Abuse*

Alex began experimenting with marijuana and alcohol at about age 13.  Substance abuse was a real problem for him by the time he began ninth grade.  In the course of preparing this case for resolution, the defense team spoke with a number of Mr. Ciccolo's former friends with whom he abused drugs and alcohol.  High School friends recall him drinking copious amounts of hard liquor along with his ADHD medication.  They also reported smoking PCP, taking Oxycontin, and just about any "pharmaceutical" that they could get their hands on.  Their behaviors became increasingly dangerous.  Some of them included crushing and snorting a variety of different pills along with powdered cannabinoids.  They used cocaine regularly, and even abused the over-the-counter drug Dramamine.  Perhaps most dangerously, Alex and his friends would order "research" chemicals on-line and consume them.  He also used Suboxone, a synthetic opioid, when he could get it.

Once he moved to Adams, he very quickly fell in with a drug and alcohol abusing crowd that included his neighbor from the apartment building in which he was living.  Interviews with these individuals and a review of some of Alex's writings from this time period demonstrate a continued use of alcohol, marijuana, cocaine, and opioids in large quantities, on a daily basis.

e.    *Nature and Circumstances of the Offense*

While Mr. Ciccolo does not dispute that he is guilty of the offenses to which he has entered a plea, it is appropriate to put his offenses in context.  Alex has always had an oppositional side to his personality.  His father recalls that when his son was twelve, the Red Sox

won their first world championship in nearly a hundred years. Alex was living in the greater

Boston area at the time, but immediately went out and bought a Yankees cap. Friends who knew

him in high school described him as a rebel who was always changing his identity and

appearance. These friends watched him go through a Latin American "gangsta" phase, a grunge

phase, and a Native American phase, before he took an interest in Islam. It seems clear in

hindsight that he was always seeking a belief system that made sense to him and brought clarity

and order to his world, which was usually muddled by drugs and alcohol.

   Mr. Ciccolo discovered Islam on his trip to California in 2012. He continued learning

about Islam, while still reading other religious texts as a member of the Peace Pagoda in Grafton,

NY, later that year. By late 2012, he was beginning to search the internet for information about

Islam, starting with basic searches of websites like www.Quran.com. Records show that by

January 2013, he was occasionally praising Allah on line, although it is clear that he was still

drinking and drugging.

   It is important to note that in addition to his substance abuse, Alex was an extraordinarily

lonesome young man. Some of his internet searches underscore this. Because of his lack of a

functioning computer and reliable internet access at his apartment in Adams, most of his time on

the internet was spent at his mother and step-father's small home in the rustic and very remote

town of Peru. Alex would spend many hours on the internet per sitting. There was something of

an addictive quality to his internet use, perhaps not surprising considering his problems with

controlled substances. Once Mr. Ciccolo began learning about Islam, it was a quick side trip into

the more extreme forms such as The Islamic State. Like many other people, Alex was genuinely

disturbed by the suffering that he saw on-line that was taking place in the Syrian civil war. By

April of 2014, he was reading propaganda from extremist sources and had begun dressing at

times in what he considered to be Islamic garb. While he continued to struggle with use of controlled substances and alcohol, he was beginning to make progress in abstaining, as is required by serious adherents to Islam. For that, he and his family were very grateful and perhaps with the benefit of hindsight, somewhat less attentive to his drift towards extreme interpretations of Islam.

As Alex looks back to how he came to support the Islamic State's efforts, he sees a number of factors that contributed to his views. First, he felt that the Islamic State was the only group that was attempting to do something about the slaughter of Syrian people by the Government of Bashar Al-Assad. Second, he was excited by his discovery of Islam and the sense of comfort that it provided him. Because he was new to the religion, he feels that he was especially susceptible to the more marginal elements who were encouraging Muslims around the world to strike back at the coalition that was fighting against the Islamic State in Syria and Iraq, by retaliating against non-believers in their home countries. Now three or four years removed from these times, Mr. Ciccolo can articulate that he interpreted this internet preaching by the Sheiks and Imams of cyberspace, as tantamount to an order for him to carry out acts of violence in order to be considered a devout Muslim. Again, it is important to note that all of this information was coming to him electronically, while he sat alone in a small cabin in a remote corner of the Berkshires. He actually had little, if any contact with actual Muslims. He attended prayer services at a mosque in Pittsfield on a couple of occasions, but did not feel that the people he met there were very serious about their religion.

Mr. Ciccolo's school records, mental health records and the like establish that he has always used violent language when he gets angry. They also establish however, that he has rarely acted on his angry rants. Nonetheless by September of 2014 his father, a Boston Police

Department Captain, became concerned about his increasingly violent rhetoric, and called the FBI. In interviews with counsel, Captain Ciccolo has said that to this day he does not believe that his son would have or could have followed through on the attempts for which he is charged, although he admits to having had concerns that he might do something smaller and more impulsive. Bob has consistently told counsel that he had multiple reasons to make the call to the FBI. One of the things that his son had been talking about was going to Syria to fight. First and foremost, he did not want his son to die in what he felt was a misguided cause, on a foreign battlefield. Second, while he was unaware of any specific plot, he was indeed legitimately concerned that Alex might harm himself or other people and did not want that on his conscience. Third, as he says, "I'm a cop. You can't tell me you are going to commit crimes and expect me to take no action to prevent it." He has acknowledged that he had concerns about his career if Alex did something, and it later came out that he had advance warnings of his son's worrisome thinking.

It is beyond dispute that Mr. Ciccolo expressed violent views in the weeks and months leading up to his arrest on July 4, 2015. It is equally clear that his violent rhetoric went no further than those with whom he was communicating on the internet, all of whom, as far as counsel is aware, were government agents or FBI cooperating human sources (CHS). It is equally clear that Alex never actually met another individual who was genuinely interested in ideologically motivated violence in this country.[3] His first meeting with a government agent took place on June 24, 2015, at which time there was general discussion of Mr. Ciccolo's nascent plan to attack New Mexico State University, a police station in Columbus, New Mexico, or a gay-friendly bar

---

[3] This assertion is corroborated by the fact that Mr. Ciccolo was not charged with conspiracy and the Government has never contended that there are unindicted coconspirators who were not charged.

in Las Cruces, New Mexico, depending on when he was asked.  It is apparent that his plans were primitive, ever-changing, and poorly thought out.

On June 30, 2015, Mr. Ciccolo had a second meeting with the government CHS, this time at a hotel room in Springfield.  This meeting was to discuss the progress that was being made towards implementation of the plan, which was to be effectuated in July or more precisely, the Muslim holy month of Ramadan.  It soon became clear that Mr. Ciccolo had made little practical progress toward implementing his plan.  For example, while he had identified a specific target or targets in New Mexico, he had no means of getting to New Mexico.  He had no automobile, no driver's license, and no one to transport him other than "another brother" (surely a Government agent) with whom he had communicated via the internet, and who was purportedly going to drive up from Florida and pick up Mr. Ciccolo, before heading to New Mexico.

At the June 30 meeting, which was of course recorded by the FBI, there was a discussion, about, among other things, where they will obtain the firepower for the planned New Mexico attack.  At one point in the recorded meeting, Alex is bragging about his savvy with guns, claiming that he "has a good background" and "knows what he is doing."  In fact, according to his father, aside from a BB gun, Alex would get to shoot a pistol and a .22 rifle for maybe an hour, once or twice a year from ages 12-16 or so, when they were vacationing in New Hampshire.  He was hardly sophisticated when it came to firearms, and in fact as far as his father knows, had neither owned nor fired a firearm in about five years.

The most poignant part of the recorded meeting between Alex and the CHS comes when the CHS and he are dividing up responsibilities for final preparations for the attack.  At one point they talk again about guns.  Alex readily agrees to take on the task of getting them, but acknowledges that he doesn't have any, nor does he have any money with which to buy them.

When the CHS presses him on how he would get them, Alex responds that he would have to

steal them.  The following exchange then takes place:

CHS: What are you thinking? I mean, what's--

Alex: Well for that I was thinking uhm,

CHS: I mean where are you going to get them from?  Do you know anybody who has, has guns

or something?  Anyone we can--

Alex: Well, there's a gun shop

CHS: Where, in wherever you live?

Alex: Well, I didn't have, anyone, any one shop in particular

CHS: Yeah

Alex: But they're around

CHS: Okay.

Alex: Uhm and, if you can get the guy at closing time, you got to be careful, you know.

CHS: Yeah, yeah, I mean you're robbing a gun shop.

This exchange clearly demonstrates that Mr. Ciccolo had given very little thought to

actually effectuating his plan.  He had nothing more than an inchoate idea to rob a yet to be

identified gun shop.  He had no firearms and no articulable plan on how he would get them.  The

fact of the matter is, that in addition to his practical problems like lack of funds and

transportation, Alex was having reservations about whether he should go through with the plan.

Despite his angry and even at times violent rhetoric, there is clearly another side to Mr. Ciccolo.

This became apparent to counsel at an initial interview about the likelihood of his pretrial

release.  Mr. Ciccolo expressed an understanding that release was unlikely, but asked counsel to

pursue it even if he were out only for a little while, so that he could just "hang out at my mom's house, watch old movies, eat popcorn and pet my cats."

Nonetheless, Mr. Ciccolo did in fact agree that he would get the Molotov cocktails and the pressure cooker bombs needed for the attack. He also got his mother to take him to the Wal-Mart in North Adams, on July 3, where he purchased a pressure cooker. When FBI agents raided his apartment the next day the pressure cooker was still in the box. Agents found common substances and materials that could have been used as shrapnel had a bomb been assembled, but they did not find the *sine qua non* of a bomb—energetic material.[4] His only plan for obtaining the necessary explosives was to buy fireworks and extract the black powder from them to use in his homemade pressure cooker bomb. Once again however, Alex lacked a practical ability to effectuate this aspect of the plan. First, the nearest place that he could have bought fireworks was in New Hampshire, and he had no way to get there. The defense investigative efforts led us to conclude that a significant amount of fireworks would have been necessary, probably about $500 worth, to render the pressure cooker sufficiently lethal, assuming that he could have assembled it properly.[5] Once again, Mr. Ciccolo had no money, nor anyone who could provide him with that amount of funds, who was not a government agent. As is now well known, the only way the plan was able to progress, was by the government CHS providing Alex with four firearms on July 4, without cost to him. He was arrested immediately thereafter.

---

[4] Likewise, the "Molotov cocktails" contained no flammable material. If they had, it is difficult to imagine how they would have been transported to New Mexico.

[5] While it is true, as the Government contends, that Mr. Ciccolo talked about putting bits of Styrofoam in the Molotov cocktails to make it stick to flesh better, the defense investigation suggests that it would not likely have functioned as intended. This is just another difference between Mr. Ciccolo's fantasized attack and what he was actually capable of doing.

13

*(2) The Need for the Sentence Imposed etc.*

§ 3553 (a)(2) contains several considerations that relate to the goals of sentencing, such as protection of the public, deterrence, rehabilitation and just desserts.

*(a) Protection of the Public*

The public is adequately protected by the agreed upon proposed sentence, which will keep Mr. Ciccolo in custody until he is in his forties, and under supervision for the rest of his life.

*(b) Deterrence*

The sentence called for under the plea agreement is a more than adequate deterrent to others contemplating engaging in the type of behavior that led to Mr. Ciccolo's conviction. Many people who have offended in a similar fashion have received shorter sentences and others were never prosecuted after being warned by the FBI of their dangerous thinking.

*(c) Rehabilitation*

The opportunity for rehabilitation is an important part of the sentencing agreement reached by the Government and Mr. Ciccolo. Mr. Ciccolo is requesting that the court recommend him for the RDAP program, due to his extensive history of abuse of controlled substances. While Mr. Ciccolo had made significant progress with his substance abuse issues after his embrace of Islam, he can certainly benefit from the RDAP program when he becomes close to his release date. Mr. Ciccolo intends to get his G.E.D. as soon as possible and to pursue higher education to the greatest extent possible while in the custody of the Bureau of Prisons.

*(d) Just Desserts*

Reasonable people can disagree as to what is deserved for committing these offenses. Rather than elaborate further, the defense urges the court to agree with us and the Government

that twenty years of incarceration and lifetime supervised is release are Mr. Ciccolo's just desserts.

### (3) Kinds of Sentences Available

Given that the parties are asking the court to adopt a Rule 11 (c)(1)(C) agreement, sentencing options are limited. Obviously, Mr. Ciccolo accepts the terms of the plea agreement and urges the court to do the same.

### (4) and (5) The Sentencing Guidelines and Policy Statements

The sentencing guidelines call for a sentence that is substantially higher than the sentence called for under the plea agreement. Nonetheless, the agreement, which has been approved by the United States Attorney for the District of Massachusetts as well as by the National Security Division of the Department of Justice, calls for the most appropriate sentence given all of the factors that the court must consider in imposing sentence, including the circumstances of the offense.

### (6) Need to Avoid Unwarranted Sentencing Disparities

There will be no unwarranted sentencing disparities between Mr. Ciccolo and other similarly situated individuals if the court adopts the agreed upon sentence. Counsel have exhaustively researched how similarly situated individuals have been treated around the country when facing these charges. The chart below summarizes some of the more relevant case from around the District and the country.

| CASE | District | Mat Supp (2339A/B) | WMD (2332a) | ISIS | AQ | Domestic Plot | Guilty Plea | SENTENCE |
|------|----------|---------------------|------------|------|----|----|------------|----------|
| Ciccolo | D. Mass. | √ | √ | √ | | √ | √ | |
| Ferdaus | D. Mass. | √ | Explosives 844(f)&2155 | | √ | √ | √ | 17 years |
| Mehanna | D. Mass. | √ | | | √ | | | 17 years |
| Wright | D. Mass. | √ | | √ | | √ | | 28 years |
| Rovinski | D. Mass. | √ | | √ | | √ | √ (cooperator) | 15 years |
| Llaneza | N.D. Cal. | - | √ (hit switch) | | | √ | √ | 15 years |
| Mujahidh | W.D. Wa. | | √ | | | √ | √ | 17 years |
| Abdul-Latif | W.D. Wa. | | √ | | | √ | √ | 18 years |
| Booker | D. Kansas | | √ (hit switch) | √ | | √ | √ | 30 years |

According to The Center on National Security at Fordham Law School, as of September, 2017, the average sentence imposed on ISIS defendants throughout the country was 14.5 years. In this District, probably the most similar case to Mr. Ciccolo's is *Ferdaus*, who received 17 years after a plea to material support and explosives offenses. Another District of Massachusetts defendant, *Mehanna,* received 17 years after being convicted at trial of a material support allegation. *Rovinski* got 15 years for material support, but he had been a cooperator. More recently, David Wright received 28 years after a fairly lengthy trial before Judge Young. The defense contends that arguably, the facts in all of these cases were more egregious than the allegations against Mr. Ciccolo.

Mr. Ciccolo's sentence would also place him midway between two defendants, *Llaneza* and *Booker*, who plead to weapons of mass destruction offenses, although each of these defendants actually attempted to detonate what they believed to be a live explosive device.

*Need to Provide Restitution*

Mr. Ciccolo has no ability to pay restitution in this case given the terms of the plea agreement.   The defense is not aware of any restitution that needs to be paid.

***Other Sentencing Considerations***

Mr. Ciccolo respectfully requests that this court make the following recommendations to the Bureau of Prisons (BOP):

1.   That at the appropriate time, the defendant be granted admission to the Residential Drug and Alcohol Program (RDAP).  This recommendation is well warranted by the defendant's long and extensive history of substance abuse.

2.   That the defendant be designated to the medium security facility[6] geographically closest to his mother and step-father who reside in Peru, Massachusetts.  The defendant specifically requests that the court recommend against commitment to a Communications Management Unit (CMU).  The purposed of the CMUs are to provide an environment in which the BOP can better monitor communications between the inmate and persons in the community.  28 C.F.R. 540.200 (c).  The Bureau of Prisons currently operates two CMU's, one in Terre Haute, Indiana and one in Marion, Illinois.  Obviously, both of these facilities are a great distance away from Mr. Ciccolo's family.  Furthermore, this defendant does not require the restrictions on communication that are imposed on inmates at those facilities.  The Government has monitored Mr. Ciccolo's communications while he has been

---

[6] The defense believes that Mr. Ciccolo will qualify for medium security placement.  If he does not, he would then request designation to the nearest high security institution which would be USP Canaan.

detained at the Wyatt Detention Facility. His visits have been almost exclusively

with his mother and step-father. His phone calls have also been exclusively or near

exclusively with his mother and step-father. He has received very little mail that is

not from his mother or step-father. Furthermore, Mr. Ciccolo had no co-conspirators.

In short there is no reason to believe that he requires the restrictive conditions of a

CMU and the resulting impact on his ability to see his mother and step-father.

3.  That the BOP place Mr. Ciccolo in a one-man cell regardless of the facility in which

    he is housed. Mr. Ciccolo has been in a one-man cell for almost the entire duration of

    his stay at Wyatt. Defense counsel would like to elaborate further on the reasons for

    this request at side-bar at the time of sentencing.


### *Conclusion*

The United States Supreme Court has said that in the post-mandatory guideline world in

which we now operate, this court "should 'consider every convicted person as an individual and

every case as a unique study in the human failings that sometimes mitigate, sometimes magnify

the crime and punishment to ensue.'" *Martin*, 520 F.3d at 91, citing *Gall*, 552 U.S. at 52. As

Justice Selya has noted, reasonableness is a "protean concept" and the boundaries of the

reasonable sentencing universe are expansive.

A great deal of effort went into reaching this plea agreement. The defendant consulted

with his two lawyers, his legal consultant, his mother and step-father and his psychologist before

agreeing to this outcome. In addition to the acceptance by the local Assistant United States

Attorneys, this agreement was approved by the National Security Division of the Department of

Justice and by the United States Attorney for the District of Massachusetts. In addition, expert

reports furnished by the defendant to the Government were reviewed by the Government's independent expert.

This case also presents a reason for this court to accept the thinking of all the parties, that is not present in virtually any other case before this court. As the court is aware, Mr. Ciccolo was turned in by his father. The Government has made no secret of it's efforts to persuade family members of persons who are talking or behaving in a manner suggestive of having fallen under the persuasion of extremist groups, to pick up the phone and call the FBI. Reasonable people can disagree as to whether the result in this case furthers the Governments hopes in this regard or not. But it is clear that a rejection by the court of a well thought out agreement, could send the wrong message to anyone considering making the difficult call to inform on a loved one.

Under all the considerations present in this very unique case, the defendant urges the court to accept the agreed upon sentences of 240 months and lifetime supervised release.

THE DEFENDANT

By   /s/  David P. Hoose
DAVID P. HOOSE,  BBO#239400
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street
Northampton, MA  01060
(413) 586-4800
(413) 582-6419 (fax)
dhoose@strhlaw.com


By   /s/  Ramzi Kassem
RAMZI KASSEM, *pro hac vice*
CLEAR Project
Main Street Legal Services
CUNY School of Law
Court Square
Long Island City, New York
(718) 340-4558
(718) 340-4478  fax
Ramzi.kassem@mail.law.cuny.edu


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this Sentencing Memorandum, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


/s/ David P. Hoose

David P. Hoose, Esq.